IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JACK FISHER and JAMES
SINNOTT,

        Defendants.

CRIMINAL ACTION NO.

1:21-cr-231-TCB-CMS

## FINAL REPORT AND RECOMMENDATION
## AND ORDER

This case is before the Court on several motions, including Defendant Jack

Fisher's Motion to Suppress Under *United States v. Tweel.* [Docs. 214 (redacted

motion), 215 (sealed motion), 274 (redacted supplement), 275 (sealed supplement)].

The Government filed a response in opposition to the motion, and Fisher filed a

reply. [Docs. 330 (redacted Government response), 331 (sealed Government

response), 370 (sealed reply), 371 (redacted reply)]. I conducted oral argument via

Zoom on December 23, 2022. Also before the Court is Fisher's Motion to Compel

Production of Instructions and Presentation to Searching Agents. [Docs. 342 (sealed

motion), 343 (redacted motion)]. The Government filed a response in opposition to

the motion to compel, and Fisher filed a reply. [Docs. 365 (response), 378 (sealed

reply), 379 (redacted reply)]. Finally, Fisher and his codefendant James Sinnott filed

a Motion for Clarification, purporting to seek clarification of a recommendation I recently made to the district judge in connection with a motion to suppress.  [Docs. 358 (sealed motion filed by Fisher), 359 (redacted motion filed by Fisher), 361 (motion filed by Sinnott)].  The Government filed a response, and Fisher filed a reply.  [Docs. 380 (redacted response), 381 (sealed response), 392 (sealed reply), 393 (redacted reply)].  For the reasons that follow, I will deny or recommend denial of each of these motions.

## I.    FISHER'S MOTION TO SUPPRESS PURSUANT TO *TWEEL*

The charged conspiracy first came to the attention of the IRS Criminal Investigation ("IRS-CI") in January 2017, when two whistleblowers came forward with evidence tending to show that Fisher and others may have engaged in a multi-year scheme to promote and sell abusive tax shelters.  [Doc. 119-6 ¶ 39 (Affidavit of Special Agent Jennifer Berry in support of the Microsoft warrant); Doc. 331 at 9].  An IRS-CI special agent was assigned to the case in September of that year, and a covert criminal investigation into Fisher and his associates was formally opened in December 2017.  [Doc. 331 at 9].

After the criminal investigation was opened and still covert, the IRS initiated multiple civil audits of partnerships for which Fisher served as the tax matters partner, the person responsible for representing the partnership before the IRS.  [Doc. 331 at 15].  Meanwhile, in an attempt to lure Fisher into implicating himself

further, the criminal agents conducted a ruse undercover audit of one of Fisher's clients who, unbeknownst to Fisher, was working with law enforcement as a confidential informant. [*Id.* at 17, 22]. The criminal investigation became overt in December 2019, when the IRS executed five search warrants at locations related to Fisher. [*Id.* at 10].

In his motion, Fisher argues that the Government violated his Constitutional rights when (A) the IRS opened and pursued civil audits of Fisher's partnerships without informing him of the ongoing covert criminal investigation into Fisher's tax-related activities; and (B) IRS-CI criminal agents deceived him in connection with the ruse undercover audit and thereby obtained information from him without his consent. Fisher asserts that such tactics are prohibited pursuant to *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). I will address these two arguments in turn.[1]

## A. The Civil Audits of Fisher's Partnerships

Because Fisher titles his motion as being brought under *United States v. Tweel*, I will provide a brief summary of that case.

---

[1] In his supplement, Fisher also complains that an IRS collections officer recently contacted him in August 2022—months after the case had been indicted and after he had retained counsel in the criminal case. [Doc. 275]. Fisher conceded at oral argument that nothing about this incident implicates *Tweel* because Fisher was well aware that he faced criminal charges at the time of the contact. Moreover, to the extent that the contact was otherwise improper, Fisher has shown no prejudice or harm.

In *Tweel*, the Fifth Circuit reversed a conviction after finding that a civil IRS agent had intentionally misled a taxpayer. In that case, the IRS opened a civil audit at the request of criminal prosecutors who were investigating organized crime. *Tweel*, 550 F.2d at 299. During the course of the civil audit, the taxpayer's accountant asked the civil IRS revenue agent whether a special agent was involved, and the revenue agent answered no. The taxpayer's records were subsequently made available to the revenue agent for copying. *Id.* at 298. Although the revenue agent's answer was technically true at the time because the criminal agent had withdrawn from the case, the Fifth Circuit found that the answer was intentionally deceptive and negated consent because the agent "did not disclose . . . that this audit was not a routine audit to which any taxpayer may be subjected from time to time," but rather was being conducted at the specific request of the Department of Justice. *Id.* at 298–99. The Fifth Circuit examined the issue as one of consent under the Fourth Amendment and found that the taxpayer had not voluntarily consented to the search (or seizure of his documents) because it was "induced by the deceit, trickery or misrepresentation of the Internal Revenue agent." *Id.* at 299. The court stated:

> the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent under the above standard and a flagrant disregard for appellant's

rights.  The silent misrepresentation was both intentionally misleading
and material.

*Id.*  In suppressing the documents and reversing the conviction, the Fifth Circuit refused to condone what it described as the IRS's "shocking conduct," commenting that "[o]ur revenue system is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities."  *Id.* at 300.

Thus, in a criminal prosecution, it may be appropriate to suppress information obtained during the course of a parallel civil proceeding if the civil agents actively concealed the possibility of criminal proceedings by deceit, trickery, or misrepresentation.  *Id.*; s*ee also United States v. Harris*, No. 1:09-cr-0406-TCB-JFK, 2010 WL 4967821, at *3 (N.D. Ga. Dec. 1, 2010) (discussing whether evidence from a civil investigation should be suppressed where the Security Exchange Commission and the United States Attorney's Office shared information).  When a defendant moves to suppress under *Tweel*, it is his burden to establish by clear and convincing evidence that "affirmative acts" by the IRS civil revenue agent materially misrepresented the nature of the inquiry.  *See United States v. Wuagneux*, 683 F.2d 1343, 1347 (11th Cir. 1982) (affirming the district court's denial of a motion to suppress on *Tweel* grounds and concluding that there was no deceit, trickery, or

misrepresentation where a civil revenue agent conducting the audit did not disclose his affiliation with an IRS Strike Force).

In his motion to suppress, Fisher contends that the Government committed a *Tweel* violation due to "active concealment of the criminal proceedings in the civil audits." [Doc. 215 at 3]. And in his reply brief, Fisher makes two related arguments: that the criminal agents and prosecutors were improperly directing the civil audit process [Doc. 370 at 4–6], and that the audits were not executed in good faith but rather were improperly serving to advance the covert criminal prosecution [*id.* at 5, 11–13].

In support of his arguments, Fisher cites to notes from the civil audit files showing that: criminal agents and civil examiners discussed whether to put the audits into suspense; even after the audits were placed into suspense, the civil examiners continued to review documents with the blessing of the prosecutor and criminal agents; the criminal agents reviewed questions drafted by the civil examiners for use in an interview; the criminal agents gave the civil revenue agents the "green light" to conduct a site visit and to request additional records; there were multiple conference calls during which civil examiners, criminal agents, and prosecutors discussed the status of the audits; and the criminal team requested that the civil examiners not interview Fisher or conduct an opening conference call with him. [Doc. 215 at 4–8].

I begin with the well-settled principle that "there is nothing inherently improper about the Government conducting parallel civil and criminal investigations, or in its agencies cooperating with each other and sharing information about those investigations." *United States v. Kowalewski*, No. 2:13-cr-45-RWS, 2014 WL 6667127, at *18 (N.D. Ga. Nov. 24, 2014). There are, however, certain constraints on how a civil proceeding must be handled in order for evidence obtained from that proceeding to be used in a subsequent criminal case.

First, as discussed above, *Tweel* holds that civil investigators (such as IRS revenue agents) cannot use deceit, trickery, or misrepresentations to obtain information; such conduct negates consent and violates the Fourth Amendment. 550 F.2d at 299. Additionally, courts have held that the Fifth Amendment Due Process Clause may be violated when a civil investigation either is being used for an improper purpose (such as to advance a criminal prosecution) or is being directed by the criminal agents or prosecutors. *Compare Harris*, 2010 WL 4967821, at *3 (finding no Fifth Amendment Due Process violation where the SEC lawyers passed on information to the U.S. Attorney's Office, but the AUSAs provided no advice and did not direct the SEC lawyers' actions); *with United States v. Scrushy*, 366 F. Supp. 2d 1134, 1137 (N.D. Ala. 2005) (suppressing evidence obtained in a civil proceeding where the "civil action and the criminal investigation improperly merged" when the U.S. Attorney's office called the SEC office, gave the SEC advice

regarding the content of a deposition and its location, and recruited a special attorney to participate in interviews).

In its response brief, the Government argues that all of the activities described in the audit notes are appropriate, citing extensively to the IRS's internal rules located in its Internal Revenue Manual ("IRM").  According to the IRM, civil and criminal investigations are separate investigations requiring "coordination between the operating divisions," and therefore "regularly scheduled coordination meetings are required."   IRM § 5.1.5.2(4) (Dec. 16, 2014).   The IRM encourages communication between the civil and criminal agents, stating that "[o]ngoing communication is essential for a successful parallel investigation" and instructing agents to "regularly coordinate their efforts," including through "case status meetings held at least quarterly."  *Id.* § 5.1.5.5(3) (Aug. 3, 2009); *id.* § 5.1.5.6(2) (Aug. 3, 2009).  These coordination efforts also require communication when "the affected operating divisions must resolve [a] conflict" to "determine how and when the civil and criminal actions should proceed."  *Id.* § 5.1.5.4(1) (Aug. 3, 2009).  That scenario contemplates that the operating divisions, along with attorneys from DOJ, will communicate to determine appropriate steps forward in the parallel investigations.  *Id.* § 5.1.5.4(2), (4) (Aug. 3, 2009); *see also id.* § 5.1.5.6(1) (requiring DOJ attorneys to be included in coordination activities).  According to the IRM, the

Civil/Criminal Coordinator from the DOJ's Tax Division may also be part of these coordination efforts.  *Id.* § 5.1.5.4(4).

The IRM recognizes that contact with taxpayers can harm an investigation if, for example, a civil interview of a taxpayer might disclose an ongoing criminal grand jury investigation.  *See* IRM § 5.1.5.3(8) (Nov. 4, 2019); *id.* § 5.1.5.7(1).  Thus, the IRM contemplates that IRS-CI "in some cases" may "request that the revenue officer not contact the taxpayer or [the taxpayer's] representative."  *Id.* § 5.1.5.7(5).  "Sharing information between revenue officers and government attorneys assigned to the case is a key ingredient in developing civil and criminal cases simultaneously and efficiently."  IRM § 5.1.5.9(1) (Aug. 3, 2009).  Moreover, at the appropriate time, "[r]evenue officers must inform CI that civil files are available" given that "[p]rosecutors have a duty to disclose certain information to criminal defendants."  *Id.* § 5.1.5.9(5).  Prosecutors' continuing disclosure obligations are such that it is "critically important" for revenue agents to "provide[] access to all the information in the collection file, including documents, interview notes and any other information that Collection gathers."  *Id.*  The IRS rules make clear, however, that IRS-CI is prohibited from "direct[ing] the revenue officer's actions in the civil investigation."  *Id.* § 5.1.5.2(4); *id.* § 5.1.5.6(3).  Thus, even though the IRS's civil and criminal divisions' efforts "*must be coordinated* to minimize adverse consequences on the criminal investigation," the coordination cannot involve

9

directing the civil side's investigative actions.   IRM § 5.1.5.3(8) (Nov. 4, 2019) (emphasis in the original).

Based on these rules, the Government argues that it was appropriate for the criminal agents and civil revenue agents of the IRS to be in touch with each other, to communicate regularly, and for the criminal agents to request that the civil agents not interview Fisher or conduct an opening conference call with him.  In his reply brief, Fisher does not argue that any of these cited provisions of the IRM are constitutionally infirm or are otherwise invalid.

I reject Fisher's first argument—i.e., that by actively working to conceal the existence of the criminal investigation (by, for example, instructing the civil auditors not to meet with Fisher so that they would not be in a position to have to answer a question about the existence of a criminal investigation), the Government violated the standards set forth in *Tweel*.  Nothing in *Tweel* requires an IRS civil revenue agent to volunteer that an ongoing covert criminal investigation exists.  Fisher does not allege or show a single affirmative act of deceit, trickery, or misrepresentation as *Tweel* requires.  Indeed, there is no evidence that any IRS civil revenue agent made a misrepresentation about the existence of the parallel criminal investigation or about anything else.  The audit notes upon which Fisher relies reveal diligent and careful efforts to ensure that the civil audits and the criminal investigation remained separate, with the agents properly coordinating their efforts.  By electing not to

interview Fisher, the IRS acted cautiously so as not to interfere with the criminal investigation and not to place its civil revenue agents in the difficult position of having to answer any potential questions Fisher might have had about a criminal investigation.  Fisher has failed to allege or show an affirmative misrepresentation by an IRS civil revenue agent that undermined his voluntary consent to produce documents in the civil audits.  Thus, I conclude that Fisher's argument fails because even though the civil auditors knew about the criminal investigation, they made no affirmative misrepresentations about it.  *See Harris*, 2010 WL 4967821, at *5 (quoting *United States v. Stringer, III*, 535 F.3d 929, 940 (9th Cir. 2008) (collecting cases)); *Wuagneux*, 683 F.2d at 1347.

I also reject Fisher's claims that there was some improper purpose for the audits.  In its brief, the Government states that the IRS was acting in the ordinary course when it initiated the audits.  According to the Government, the IRS invested substantial resources to civilly examine the vast majority of entities involved in syndicated conservation easements throughout the country (more than 80% of all listed syndicated conservation easement transactions) as a matter of course and has conducted hundreds of audits relating to such transactions.  [Doc. 331 at 18, 28].  According to the Government:

> Conducting parallel civil and criminal investigations allows the IRS to pursue civil enforcement not only along with criminal investigations but also, and importantly, in the absence of a criminal prosecution or conviction. Given the three-year civil statute of limitations for audits,

11

this parallel investigation principle serves the IRS's purpose of
ensuring the collection of tax revenues and enforcement of tax laws.
Accordingly, if IRS-CI or DOJ had recommended against prosecution,
or if the prosecutions failed to obtain criminal convictions, the parallel
investigation ensures that the IRS (and the American taxpayer) is not
left without a remedy against promoters of fraudulent tax schemes.
Similarly, pursuing a criminal investigation in parallel with civil audits
allows the government to pursue a conviction, intended to deter future
bad action (beyond collecting the tax revenue lost through abusive tax
shelters).

[*Id.* at 29].  Moreover, the Government has shown that at least one of the civil audits

began years before the criminal investigation began and others began at or near the

time that the IRS-CI was assigned to the case.  [*Id.* at 28].  Fisher has not refuted any

of these assertions.  I conclude that Fisher has not shown that there was any improper

enforcement purpose for the audits.

Finally, I also reject Fisher's argument that the civil audits were being directed

by the criminal agents or prosecutors.  The communications that Fisher points to

amount to the civil auditors being told to conduct their audit in the normal course

with one exception—not interviewing Fisher.  They do not show that IRS-CI

directed civil to initiate the audits, to take certain specific audit activities, or to

request certain records.  The notes reveal that although the civil auditors were aware

of a parallel criminal investigation, they were not being instructed to act in any

unusual way, other than not to interview Fisher.  As noted above, the notes that

Fisher includes in his motion paint a picture of careful efforts to comply with the

IRS rules governing parallel proceedings and to ensure proper and appropriate coordination between the civil examination and the criminal investigation.

## B. The Ruse Undercover Audit

Fisher also complains about criminal agents' use of the "ruse audit" tactic to obtain evidence against him.

In 2018, criminal investigators set up an investigative undercover audit (the "UC Audit") of a confidential informant. The circumstances surrounding the UC Audit were described in a search warrant affidavit executed by the lead case agent. [Doc. 119-5 (Affidavit of Special Agent Jennifer Berry in support of the premises warrants)]. The affidavit explains that in July 2018, the IRS initiated the UC Audit, creating the ruse that the IRS was auditing the tax returns of a confidential informant referred to as "CI-2," who had purchased a deduction from Fisher's funds. [Doc. 119-5 ¶ 80; Doc. 331 at 18]. An IRS-CI undercover criminal agent posed as a civil auditor and mailed a fake audit package to CI-2. [Doc. 119-5 ¶ 80]. The package included fake Information Document Requests seeking, among other things, substantiation related to the conservation easement deductions, including copies of the purchase and sale agreements and other documents. [*Id.* ¶¶ 80, 81]. Then, another confidential informant notified Fisher about the audit, at which point Fisher voluntarily offered his services to assist CI-2 with responding to the audit. [*Id.;* Doc. 331 at 19]. During the course of the UC Audit, Fisher and others allegedly conspired

to provide backdated documents in order to substantiate the conservation easement deductions on CI-2's income tax returns, and Fisher provided incriminating evidence to the informants.   [*Id.* ¶ 80].   Fisher seeks to exclude all evidence that the Government obtained in connection with the UC Audit, complaining that during "this criminal investigation disguised as a civil audit, the government collected documents and information from Mr. Fisher." [Doc. 215 at 11].

In making his argument, Fisher lumps the UC Audit in with his arguments concerning the real audits discussed above, claiming that the UC Audit falls under *Tweel.* This argument is meritless.  Different rules apply to civil investigations and undercover criminal investigations.  In the criminal context, "the Fourth Amendment allows some police deception so long [as] the suspect's will was not overborne." *United States v. Spivey*, 861 F.3d 1207, 1214 (11th Cir. 2017) (internal brackets, quotation marks, and citation omitted).  According to the Eleventh Circuit:

> Not all deception prevents an individual from making an essentially free and unconstrained choice.  For example, undercover operations do not invalidate consent.  When an undercover agent asks to enter a home to buy drugs, the consent is voluntary despite the agent's misrepresentations about his identity and motivation.

*Id.* (internal quotation marks and citations omitted).

Here, the IRS did not actually conduct an audit of Fisher or any of his partnerships.  The UC Audit was not actually an audit at all; it was merely a law enforcement tool designed to see if Fisher would take steps to further incriminate

himself.   According to the Government (and not disputed by Fisher), during the course of the ruse, Fisher had minimal contact with the informants, had no contact with the undercover special agent who was posing as a revenue agent, and provided no documents directly to the Government.  [Doc. 331 at 18, 19, 21].  Fisher fell for a Government-created ruse designed to elicit incriminating information from willing participants during the course of an investigation; there is nothing improper about this technique.  *See, e.g., United States v. Sidoo*, No. 19-10080-NMG, 2020 WL 2308807, at *1 (D. Mass. May 8, 2020) (noting that there was nothing improper in the Operation Varsity Blues college-admissions-scandal investigation where the Government instructed a confidential informant to make recorded calls to the targets of the investigation, using a ruse that the informant's charity was being audited by the IRS).  And nothing about this factual scenario fits within the ambit of *Tweel*.[2] *See Spivey*, 861 F.3d at 1213 (noting that the Eleventh Circuit has never applied *Tweel* outside of the administrative context).

---

[2] Moreover, even if there was something improper about the ruse, I agree with the Government that Fisher had no reasonable expectation of privacy in any of the documents that he provided to the confidential informants during the undercover audit, and therefore Fisher lacks standing to seek to suppress the evidence.  [Doc. 331 at 21–23].

## II.   MOTION TO COMPEL PRODUCTION OF INSTRUCTIONS AND PRESENTATION TO SEARCHING AGENTS

In December 2019, the Government obtained federal warrants to search multiple locations related to its criminal investigation of Fisher and the alleged illegal tax shelter scheme that is the subject of this criminal case.  In preparation for the execution of the warrants, the executing agents viewed an operational PowerPoint presentation that contained background information, including the plan for the execution of the warrants, safety and law enforcement tactics, and other operational specifics.  Fisher was later indicted in this criminal action and has now filed a motion to compel production of the PowerPoint.  [Doc. 342].

The basis for this request is Fisher's desire to understand the Government's "interpretation of the law."  [*Id.* at 2].  According to Fisher, allowing him access to the PowerPoint will support several of his defenses because he expects the PowerPoint to show that the Government's view of the law at the time the warrants were executed comported with his own view of the law at that time.  He seeks to use the information in the PowerPoint to show that the law at issue is uncertain, vague, or unclear and that the Government is operating under an incorrect interpretation of the law because it "molded the law to fit the facts."  [*Id.* at 4–5].  Fisher argues that because the PowerPoint could be used to demonstrate that the Government's view

of the law has evolved over time, it amounts to *Brady* material and therefore must be produced.[3] [*Id.* at 7].

The Court has previously rejected Fisher's arguments that his case should be dismissed due to uncertainties in the law, that this criminal prosecution is premised on an incorrect interpretation of the law, and/or that Fisher is entitled to otherwise non-discoverable information so that he can examine whether the Government's legal theory has evolved over the course of the investigation. [Doc. 311 at 16–34 (order concluding that the indictment passed muster and that the law Fisher is accused of violating is not uncertain or vague); Doc. 224 at 19 (order noting that Fisher's concern about legal instructions and the Government's legal theory presented to the grand jury was not a "compelling and particularized need" that would require production of grand jury materials)]. Moreover, the Court has rejected similar speculation by Fisher that internal Government documents should be produced because they might show the evolution of the Government's legal theories.

---

[3] Additionally, Fisher states that he wishes to use the PowerPoint to challenge the credibility of the witnesses, especially the lead case agent. [Doc. 365 at 6]. If Fisher is seeking the statements of prospective Government witnesses, then that request is governed by the Jencks Act, 18 U.S.C. § 3500. *See* FED. R. CRIM. P. 16(a)(2). The Government states that it has produced and continues to produce possible Jencks Act materials for prospective witnesses, but that it does not intend to call as witnesses at trial the agents who gave the PowerPoint presentation. [Doc. 365 at 16]. As such, their statements and reports are not discoverable under the Jencks Act. *See* 18 U.S.C. § 3500(a).

[Doc. 363 at 9–10 (rejecting Fisher's argument that the special agent's report must be produced under *Brady*)].

Here, Fisher's latest request seeks to avoid the general rule that internal Government documents are exempt from disclosure. Indeed, Federal Rule of Criminal Procedure 16 specifies that precisely the type of information that Fisher seeks in this motion—"reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case"—falls into the category of "Information Not Subject to Disclosure." FED. R. CRIM. P. 16(a)(2); *see also United States v. Jordan*, 316 F.3d 1215, 1251–52 (11th Cir. 2003). Fisher speculates that the PowerPoint contains *Brady* material, but he has failed to substantiate this claim. Nothing in his motion shows that the PowerPoint might contain evidence that "in the eyes of a neutral and objective observer, could alter the outcome of the proceedings." *Jordan*, 316 F.3d at 1252. Fisher has failed to show that anything in the PowerPoint might be material to the defense. "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" *Id.* at 1252 n.81 (collecting cases). Nor does Fisher's speculation necessitate an in-camera review. *See United States v. Morris*, 957 F.2d 1391, 1402–03 (7th Cir. 1992) (affirming district court's denial of defendants' Brady request for

FBI reports, without an in-camera review, where the defendants merely speculated that the reports may contain Brady material).

In its response brief, the Government states that the PowerPoint "contains law enforcement-sensitive information and does not contain *Brady* material," and Fisher has presented nothing that would cause me to doubt the Government's position. [Doc. 365 at 6]. Fisher's speculation is insufficient to justify requiring the disclosure of the law enforcement-sensitive information.[4] Accordingly, I conclude that the PowerPoint falls within the ambit of Federal Rule of Criminal Procedure 16(a)(2) and is not discoverable because it is an internal Government document created in connection with investigation of the case. FED. R. CRIM. P. 16(a)(2); *see also Jordan*, 316 F.3d at 1251–52. The Government has stated that the PowerPoint does not contain *Brady* material, and I have no reason to doubt that assertion.

As such, the motion to compel will be denied.

## III.   MOTION FOR CLARIFICATION

Fisher has also filed a Motion for Clarification, which his codefendant James Sinnott has adopted. [Docs. 358, 359, 361]. Fisher claims to be seeking clarification of a point I made in my Report and Recommendation dated November 22, 2022

---

[4] To the extent Fisher claims that the PowerPoint could be useful to him in connection with establishing good faith, lack of willfulness, and/or reasonable reliance on a Government official, these arguments fail because he could not have relied on (or been persuaded by) a PowerPoint presentation that he never saw.

[Doc. 352], where I addressed, among other things, the admissibility of evidence obtained during the Rainwater Drive search.   Under the guise of asking for clarification of my recommendations, Fisher asks the Court to exclude a completely different class of evidence, i.e., certain evidence obtained by a subpoena.  [Doc. 358 at 4].  Having reviewed the briefs, I conclude that clarification is not needed.  If Fisher and Sinnott wish to challenge the admissibility of evidence obtained by subpoena or other means, they may take this up with the district judge prior to trial. The admissibility of the evidence obtained by subpoena was not before me when I issued my Report and Recommendation, and I will not address it in the context of a request for clarification.  The motions for clarification, therefore, will be denied.

## IV.    CONCLUSION

For the reasons stated, I see no basis for suppressing either the records that Fisher turned over during the civil audits or the documents that he provided to the confidential informants as a result of the UC Audit.  I therefore **RECOMMEND** that the Motion to Suppress Under *United States v. Tweel* [Docs. 214, 215] be **DENIED**.  Fisher's Motion to Compel Production of Instructions and Presentation to Searching Agents [Docs. 342, 343] is **DENIED**.  The Motions for Clarification [Docs. 358, 359, 361] are also **DENIED**.

There are no other pending matters before me in this case. Accordingly, the case is hereby **CERTIFIED** ready for trial.

So **ORDERED**, this 6th day of January, 2023.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE